# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT JACKSON

GREG SWAFFORD, M.D., )
                          )
      Plaintiff/Appellant, )       Shelby Law No. 54167
                          )
vs. )
                          )       Appeal No. 02A01-9612-CV-00311
MEMPHIS INDIVIDUAL PRACTICE )
ASSOCIATION, SOUTHERN HEALTH )
PLAN, INC., THE APPLE PLAN, a )
Product of the Southern Health Plan, )
Inc., a Federally Qualified Health )
Maintenance Organization, BLUE )
CROSS AND BLUE SHIELD OF )
TENNESSEE, INC., THCC, INC., a )
Tennessee Non-Profit Corporation, )
                          )
      Defendants/Appellees. )

FILED

June 2, 1998

**Cecil Crowson, Jr.**

Appellate Court Clerk

### APPEAL FROM THE CIRCUIT COURT OF SHELBY COUNTY
### AT MEMPHIS, TENNESSEE

### THE HONORABLE ROBERT L. CHILDERS, JUDGE

For the Plaintiff/Appellant:

William J. Simmons
Memphis, Tennessee

For the Defendants/Appellees
Memphis Individual Practice
Association and Southern Health Plan, Inc.:

John I. Houseal, Jr.
William L. Bomar
Leo Bearman, Jr.
Sean M. Haynes
Gary K. Smith
Steven S. Heinrichs
Memphis, Tennessee

**REVERSED IN PART,
AFFIRMED IN PART
AND REMANDED**

HOLLY KIRBY LILLARD, J.

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J.

**OPINION**

This is a libel suit brought by a physician against a health maintenance organization and related health insurance entities. The trial court granted summary judgment in favor of the defendants based on the statute of limitations. The lawsuit involves allegedly false information reported to the National Practitioner Data Bank. In an issue of first impression, we hold that each dissemination of the allegedly defamatory information by the Data Bank gives rise to a separate cause of action. The grant of summary judgment is affirmed in part and reversed in part, and the cause is remanded.

Plaintiff/Appellant Greg Swafford, M.D. ("Dr. Swafford") is a licensed physician practicing family medicine in Shelby County. Defendant/Appellee Southern Health Plan, Inc. ("Southern") is a federally qualified health maintenance organization operating in Tennessee. Southern hired Defendant/Appellee Memphis Individual Practice Association ("MIPA") to promote, sell, and manage an insurance product known as "The Apple Plan." MIPA is responsible for supervising physicians who treat Apple Plan policyholders in Tennessee.[1] Southern and MIPA may collectively be referred to as "the Defendants."

In February 1990, the parties entered into a contract entitled "MIPA Participating Primary Care Physician Agreement" ("Agreement"). The Agreement required MIPA to refer a specified number of Apple Plan patients to Dr. Swafford and required Dr. Swafford to treat the patients referred to him. The Agreement stated that either party could withdraw from the Agreement upon ninety days' notice.

In early 1991, Dr. Swafford was notified that the Defendants intended to sanction him for substandard care. On April 17, 1991, Dr. Swafford received a notice of termination due to alleged violations of quality of care standards.[2] Dr. Swafford believed that the assertion of substandard care was false, but did not object to his termination.

On August 22, 1991, the Defendants reported Dr. Swafford's termination to the National Practitioner Data Bank ("Data Bank"). The Data Bank operates pursuant to 42 U.S.C.A. §§ 11131, *et. seq.* (1995), and maintains a data base of information concerning health care providers. Among

---

[1] Dr. Swafford also sued Blue Cross Blue Shield of Tennessee and THCC, Inc.; these parties were voluntarily dismissed without prejudice and are not involved in this appeal.

[2] Defendants assert that this April 17, 1997, notification gave Dr. Swafford notice that he would be terminated 90 days thereafter. Dr. Swafford maintains that he was terminated effective on April 17, 1997, without advance notice.

other requirements, the Act imposes a mandate that all health care entities report adverse professional review actions to the Data Bank. *Id.* § 11133. Information in the Data Bank is confidential and can be accessed only by health care entities. *Id.* § 11137(b).

Dr. Swafford alleged that, at the time that the Defendants reported his termination to the Data Bank, he was unaware of the report's existence. In January 1992, Dr. Swafford was notified by the Data Bank that the Defendants had reported that his clinical privileges had been revoked due to violations of quality of care standards. Dr. Swafford was uncertain about the specific number of instances in which health care entities accessed his information from the Data Bank; however, at least three entities have retrieved information from the Data Bank: Baptist Hospital, St. Francis Hospital, and the Tennessee Board of Medical Examiners. None denied clinical privileges to Dr. Swafford. Nevertheless, Dr. Swafford maintains that the existence of the Data Bank report forced him to defend his record to these entities by demonstrating that the charge of substandard care was false. The record does not clearly indicate when each of these health care entities retrieved information from the Data Bank or when Dr. Swafford became aware that the information had been retrieved.[3]

Dr. Swafford filed a lawsuit against the Defendants on June 1, 1993. The case was removed to federal court and the parties engaged in considerable discovery. On April 28, 1995, Dr. Swafford filed an amended complaint that appears to allege several causes of action, including defamation, injury to personal property, intentional infliction of emotional distress, outrageous conduct, tortious interference with business relations, and civil conspiracy. The federal court remanded the case to state court. Both parties filed cross-motions for summary judgment. In their motion, the Defendants argued that the gravamen of Dr. Swafford's Complaint is libel and is barred by a one-year statute of limitations. The Defendants also maintained that Dr. Swafford failed to satisfy the elements of certain other claims.

On June 6, 1996, the trial court entered a succinct order granting the Defendants' motion for summary judgment, without elaborating on its reasoning. From this order, Dr. Swafford now appeals.

---

[3] Dr. Swafford filed an affidavit stating that he learned of the retrieval of the allegedly defamatory information by St. Francis Hospital on March 6, 1995. Dr. Swafford's brief claims that Baptist Hospital accessed the information in July of 1992, but this assertion is not clearly supported by the record.

On appeal, Dr. Swafford asserts that the trial court erred by granting summary judgment to the Defendants. Dr. Swafford argues that the trial court misapplied the one year statute of limitations for injury to person as opposed to the three year statute for injury to property. Dr. Swafford also contends that the trial court improperly utilized the "single publication rule" for the alleged defamation, as opposed to the "multiple publication rule." Finally, Dr. Swafford argues that the trial court erred by not applying a three year statute of limitations to the civil conspiracy charge, and that his claim for tortious interference with business relations should not have been dismissed.

In addition to responding to Dr. Swafford's contentions, the Defendants assert that his appeal should be dismissed due to Dr. Swafford's "fatal procedural errors." The Defendants allege that Dr. Swafford failed to comply with Rules 4(a), 24(a), and 24(d) of the Tennessee Rules of Appellate Procedure. We will first address the procedural issues.

The trial court granted summary judgment to the Defendants on June 6, 1996. Dr. Swafford filed a notice of appeal on July 8, 1996. He also filed a post-judgment motion pursuant to Rules 59.02 and 59.04 of the Tennessee Rules of Civil Procedure. Dr. Swafford's post-judgment motion was denied on October 7, 1996. Under Rule 4(b) of the Tennessee Rules of Appellate Procedure, the time period for filing his notice of appeal ran from the denial of this post-judgment motion. Dr. Swafford did not file another notice of appeal after his post-judgment motion was denied. The Defendants argue that Dr. Swafford's failure to file a second notice of appeal violates Rule 4(a) of the Tennessee Rules of Appellate Procedure.

Rule 4(a) of the Tennessee Rules of Appellate Procedure provides that the notice of appeal "shall be filed . . . within 30 days after the date of entry of the judgment appealed from. . . ." Based on this provision, the Defendants argue that Dr. Swafford's appeal should be dismissed. However, Rule 4(d) of the Rules of Appellate Procedure provides:

> A prematurely filed notice of appeal shall be treated as filed after entry of the judgment from which the appeal is taken and on the day thereof.

The Advisory Commission Comment to Rule 4(d) states that Rule 4(d):

> establishes the general rule that the right to appeal is not lost by filing notice of appeal before entry of the judgment appealed from. The Commission is concerned that some lawyers have misread the original draft and have failed to file a new notice of appeal when the earlier notice is of "no effect" because a motion disposition intervened. Believing that even a premature notice of appeal suffices to inform the
>
> adversary that an appeal is intended, the Commission proposes deleting portions of

3

> subdivisions (b) and (d) to give an early notice an effective date identical to the date of entry of an order overruling a post-trial motion.

Under 4(d), a prematurely filed notice of appeal may be deemed timely. *See Gaskill v. Gaskill*, 936 S.W.2d 626, 630 n.4 (Tenn. App. 1996). We find that Dr. Swafford's notice of appeal was timely under Rule 4(d). Rule 4(a) does not bar this appeal.

Defendants also argue that the appeal should be dismissed because Dr. Swafford violated Rule 24(d) of the Tennessee Rules of Appellate Procedure by not timely filing a statement that no transcript was to be filed, and also violated Rule 24(a) by failing to timely file a description of the record.

Rule 24 concerns the preparation and filing of the record on appeal. Although the requirements are important, failure to comply with Rule 24 does not always warrant dismissal of the appeal:

> The provisions of Rule 24 regarding the designation, preparation and certification of the transcript are clear and unambiguous. A brief review of the rule prior to filing a notice of appeal will provide adequate instruction to careful counsel. Nonetheless, we hold that in this case, the dismissal of this appeal was inconsistent with the spirit and intent of the rules.

*Johnson v. Hardin*, 926 S.W.2d 236, 240-241 (Tenn. 1996). This issue is without merit. Consequently, we shall address the substantive issues raised on appeal.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.03. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allowing all reasonable inferences in favor of that party, and discarding all countervailing evidence. *Id.* at 210-11. Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *Id.* Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *Id.*

The applicable statute of limitations is determined by the gravamen of the action, rather than

4

the designation of the case as lying in tort or contract. ***Taylor v. Trans Aero Corp.***, 924 S.W.2d 109, 113 (Tenn. App. 1995). We look at the subject matter of the lawsuit, rather than the remedial procedure used. ***Id.*** (citing ***Williams v. Thompson***, 223 Tenn. 170, 172, 443 S.W.2d 447, 449 (1969)).

There is little dispute in this case that the gravamen of Dr. Swafford's action is libel. ***See, e.g., Brown v. Dunstan***, 409 S.W.2d 365, 367 (Tenn. 1966); ***Yater v. Wachovia Bank***, 861 S.W.2d 369, 372 (Tenn. App. 1993). The trial court properly applied the one year statute of limitations for "[a]ctions for libel, [and] for injuries to the person . . . ." Tenn. Code Ann. § 28-3-104 (Supp. 1997).

Next we must determine whether the one-year statute of limitations had expired when the plaintiff filed his lawsuit. It is undisputed that the lawsuit was filed more than one year after Dr. Swafford learned that the allegedly defamatory information had been reported to the Data Bank. However, it appears that at least one instance in which the information was accessed may have taken place within the one-year limitations period. To resolve this issue, we must determine (1) whether the "single publication rule" should apply in this case, and (2) when the limitations period commenced for each claim.

Under the "traditional common law approach" in libel cases, an independent cause of action exists for each dissemination of a defamatory statement. ***Applewhite v. Memphis State Univ.***, 495 S.W.2d 190, 191, 193 (Tenn. 1973). Distribution of multiple copies of libelous materials created multiple claims, "each one accruing at the time of distribution." ***Id.*** at 193. This is known as the "multiple publication rule." ***Id.***

In response to the problems created by a multiplicity of lawsuits, the "single publication rule" developed. The single publication rule is an exception to the traditional view that each of several communications to a third person by the same defamer is a separate publication. Under this exception, "[a]ny one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication." Restatement (Second) of Torts § 577A(3) (1977).

The comments to the Restatement indicate that the reason for the single publication rule is to avoid the "numerous suits" that may culminate from the publication of a "large-scale communication." Restatement (Second) of Torts § 577A cmt. c; ***see also Applewhite***, 495 S.W.2d at 193-94. The Restatement comments state that the single publication rule does not apply to

5

"aggregate publications on different occasions." Restatement (Second) of Torts § 577A cmt. d. The Restatement explains:

> if the same defamatory statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication and there are two causes of action. The same is true of a rebroadcast of the defamation over radio or television or a second run of a motion picture on the same evening. In these cases the publication reaches a new group and the repetition justifies a new cause of action. The justification for this conclusion usually offered is that in these cases the second publication is intended to and does reach a new group.

*Id.*

The single publication rule was recognized in Tennessee in *Applewhite v. Memphis State Univ.*, 495 S.W.2d 190 (Tenn. 1973). In *Applewhite*, the plaintiff filed suit against the author of a book and its publisher for allegedly libelous remarks contained in the book. The trial court dismissed the action, ruling that the statute of limitations expired prior to the filing of the lawsuit. The plaintiff appealed. *Id.* at 191. Adopting the single publication rule, the Supreme Court held:

> The single publication rule is suited to the contemporary publishing world where large numbers of copies of a book, newspaper, or magazine are circulated. It would substantially impair the administration of justice to allow separate actions on each individual copy and it would create the possibility of harassment, and multiple recoveries against defendants. Therefore, we hold under Tennessee law a plaintiff should be limited to a single cause of action based on the circulation of copies of an edition of a book, newspaper, or periodical.

*Id.* at 194. Thus, for an "aggregate communication" such as book or newspaper, the single publication rule applies.

In this case, the Data Bank is an electronic data base that stores information related to the quality of care of physicians. Each transmission by the Data Bank of the report on Dr. Swafford was released in response to an affirmative request by a hospital or other health care entity. Information stored in the Data Bank may be accessed only by certified health care entities.

The Defendants argue that, once the information is stored on the Data Bank, it becomes openly accessible to the public and is akin to the "circulation of copies of an edition of a book, newspaper, or periodical." *Applewhite*, at 194. The Defendants contend that any alleged injury occurs when the information is stored on the Data Bank. Dr. Swafford, on the other hand, argues that the single publication rule is not applicable to these facts. He contends that injury does not

6

occur until the information stored on the Data Bank is requested and retrieved by individual health care entities.

Whether the single publication rule should be applied to the dissemination of alleged defamatory information in the Data Bank to health care providers is an issue of first impression in Tennessee. We found no published decisions in other states addressing this issue.

Since there are no reported defamation cases on the access of Data Bank information, we look to decisions with analogous facts.[4] Several courts have considered when the cause of action accrues for an action arising out of an allegedly defamatory statement in a credit report.[5] In *Hyde v. Hibernia Nat'l Bank*, 861 F.2d 446 (5th Cir. 1988), the plaintiff claimed that the defendant bank had submitted to the defendant credit reporting agency an erroneous statement that the plaintiff had failed to pay a debt. Although the plaintiff was aware of the false information in his credit report, he took no action to remedy the error. Three years later, a credit card company rejected the plaintiff's application for a credit card. *Id.* at 447. The plaintiff then filed suit for negligent violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.A. §§ 1681 *et. seq*.[6]

The FCRA includes a two-year statute of limitations which begins to run "from the date on which the liability arises." 15 U.S.C.A. § 1681p (1998). After considering several alternatives for when "liability arises," the Fifth Circuit held that liability arises on the date on which credit was denied to the consumer, because this is the date "on which injury is inflicted." *Hyde*, 861 F.2d at 449. *Hyde* states:

> The day the report is transmitted to a user is usually the date on which injury is inflicted, since that report is used by the institution as the basis for its denial of credit to the consumer. Because the tort is inchoate until the victim is injured, the date upon which the erroneous information is transmitted by the credit agency to the potential user corresponds to the date on which the limitations period for the tort begins.

---

[4] As of the filing of this opinion, no reported cases address the statute of limitations in the context of defamation on the Internet. Undoubtedly this will be an issue in the future. *See* James E. Stewart & Laurie J. Michelson, *Cyberspace Defamation*, 75 Mich. B.J. 510, 512 (1996); Byron F. Marchant, *On-Line on the Internet: First Amendment and Intellectual Property Uncertainties in the On-Line World*, 39 How. L.J. 477, 503 n.90 (1996).

[5] This issue was raised in *Yater v. Wachovia Bank*, 861 S.W.2d 369, 372-73 (Tenn. App. 1993), but it was not necessary to resolve it in that case.

[6] Enacted in 1970, the FCRA was designed to require credit reporting agencies to maintain "reasonable procedures" to ensure that accurate consumer information is reported. 15 U.S.C.A. §§ 1681(b) and 1681e(a) (1998). Under the Act, an injured consumer may sue a credit reporting agency for failure to comply with requirements set forth in the Act. 15 U.S.C.A. § 1681o (1998).

*Id.*[7] The **Hyde** Court discussed whether later dissemination of the same credit report constituted a separate cause of action to which a distinct limitations period would attach. After discussing the application of the single publication rule in defamation suits, the Court stated:

> We do not find the rationale underlying the single-publication rule applicable to the Fair Credit Reporting Act. The major harm may, indeed, result from the first transmission of defamatory material to an institution, but the confidential nature of a credit report necessarily means that each new issuance results in a distinct and separate injury. The Restatement of Torts (2d) § 577A appears to diverge from the single-publication rule in its Comment on subsection (1) when it states that "each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." We adopt the Restatement's formulation and conclude that each transmission of the same credit report is a separate and distinct tort to which a separate statute of limitations applies.

*Id.* at 450.

Similarly, in **Lawhorn v. Trans Union Credit Info. Corp.**, 515 F. Supp. 19 (E.D. Mo. 1981), the plaintiff brought a claim under the FCRA, alleging that the defendant credit reporting agency had repeatedly violated the Act by failing to ensure the accuracy of the plaintiff's credit report. The plaintiff claimed that the defendant's violations were in the nature of a "continuing violation," resulting in the denial of credit on more than one occasion over the course of several years. *Id.* at 19-20. The court rejected the plaintiff's "continuing violation" theory, holding that "liability arises, if at all, when defendant's practices lead to the preparation of an erroneous or incomplete consumer report." *Id.* at 20.

The court interpreted the FCRA as recognizing separate violations of the Act for the dissemination of each report. *Id.* Thus, "the date of the report would signal the beginning of the running of the statute of limitations," and the plaintiff was permitted to recover for violations that occurred within the two year limitations period. *Id.; see also Wilson v. Porter, Wright, Morris & Arthur*, 921 F. Supp. 758, 761 (S.D. Fla. 1995) ("[T]he alleged violations of the FCRA committed by [the credit reporting agency] took place when the credit reports were issued. . . ."); *Koropoulos v. The Credit Bureau, Inc.*, 734 F.2d 37, 39 (D.C. Cir. 1984) (holding that the provisions of the FCRA allow a consumer to bring suit "only if a credit reporting agency issues an inaccurate report

---

[7] In support of this holding, the Court cited a law review article that drew an "analogy to the common law rule in commercial defamation cases." *Hyde*, 861 F.2d 446, 449 (citing Martha F. Davis, *Solving Statute of Limitations Problems under Fair Credit Reporting Act*, 18 Ind. L. R. 507, 514 (1985)).

on the consumer, since only then does harm flow from the agency's violation."); Ralph V. Seep, Annotation, *Running of Statute of Limitations in Civil Actions Under Fair Credit Reporting Act*, 111 A.L.R. Fed. 647 (1993).

In ***Schneider v. United Airlines, Inc.***, 256 Cal. Rptr. 71 (Cal. App. 1989), the plaintiffs filed a defamation lawsuit against the defendants for transmitting allegedly false information to a credit reporting agency. The plaintiffs claimed that the information was transmitted with the intent that the credit agency would republish the information. A few months later, the plaintiffs were notified by a bank ("Bank 1") that their applications for credit cards were rejected. Bank 1's rejections were due in part to the credit report. Several weeks later, the plaintiffs received a copy of the credit report. Several months after this, the plaintiffs learned that the credit reporting agency had republished the information to a second bank ("Bank 2"). Based in part on the credit report, Bank 2 denied the plaintiffs' request for credit. The plaintiffs' lawsuit was filed more than one year after the transmission of the credit information from the defendants to the credit reporting agency. The lawsuit was also filed more than one year after the transmission of the information from the credit reporting agency to Bank 1. However, the lawsuit was filed within one year of the transmission of the information by the agency to Bank 2. The plaintiffs argued that the republication to Bank 2 was within the one-year statute of limitations for libel. *Id.* at 73. The trial court ruled that the cause of action accrued at the time the plaintiffs discovered the existence of the allegedly false credit report.

The California Court of Appeals reversed the trial court's ruling. *Id.* at 74. Distinguishing the case from instances in which the single publication rule was applied, the Court held that "where republication reaches a new entity or person, repetition justifies a new cause of action." *Id.* at 75. Citing the traditional common law approach, the Court found that the credit reporting agency's dissemination of the credit report to Bank 1 and Bank 2 "constituted two separate publications," and that the plaintiffs had two independent causes of action. *Id.* at 76. Consequently, the Court ruled that the plaintiffs' action for libel for the dissemination of the information to Bank 2 was timely. *Id.; but see Ferber v. Citicorp Mort., Inc.*, No. 94 Civ. 3038, 1996 WL 46874, at *6 (S.D.N.Y. Feb. 6, 1996) ("[W]e find that [the defendant's] alleged 'continued reporting' was not a republication giving rise to a new cause of action.")

The facts in this case are analogous to the facts in the above credit report decisions. Unlike the mass publication of a book, magazine, or television commercial, it is unlikely that more than a

9

handful of individuals or entities would gain access to information stored in the data base. Unlike *Applewhite*, the information stored in the Data Bank is not within the domain of the "contemporary publishing world." *Applewhite*, 495 S.W.2d at 194. In addition, the health care entities in this case, like the entities accessing credit information, requested information from the Data Bank on separate and distinct occasions. Therefore, there is no "*aggregate* publication" as contemplated in cases applying the single publication rule. While information in the Data Bank may be accessed by several entities, the justification for the single publication rule, a vast multiplicity of lawsuits resulting from a mass publication, is simply not present here. Under the facts of this case, we hold that the single publication rule is inapplicable.[8] Therefore, a separate limitations period attaches to each publication.

We must next consider the date on which Dr. Swafford's cause of action accrued, i.e., the date on which the limitations period began to run. The statute of limitations commences when the plaintiff has a cause of action. *R.J. Reynolds Tobacco Co. v. Carson*, 187 Tenn. 157, 172, 213 S.W.2d 45, 51 (1948). The cause of action accrues when the plaintiff attains the right to sue. *Armistead v. Clarksville-Montgomery County School System,* 222 Tenn. 486, 490, 437 S.W.2d 527, 528-29 (1969). In *Shell v. State*, 893 S.W.2d 416, 422 (Tenn. 1995), the Tennessee Supreme Court held:

> Under the law of Tennessee, a cause of action accrues when the plaintiff suffers in actuality a legally-cognizable wrong and thus acquires a right to bring suit for redress. Where, as here, it is alleged that the defendants disseminated wrongfully untruthful information about the plaintiff, the cause of action accrues, and the statute of limitations begins to run, at the time such dissemination takes place.

(citations omitted).

In this case, the information was transmitted from the Defendants to the Data Bank on August 22, 1991. It is undisputed that Dr. Swafford had notice of this transmission in January 1992 at the latest. Dr. Swafford filed his lawsuit in June 1993. Therefore, if the limitations period began to run at the point of transmission to the Data Bank or at the point of discovery by Dr. Swafford, Dr. Swafford's action would be time-barred, since both dates are beyond the one-year statute of limitations for libel. Tenn. Code Ann. § 28-3-104 (Supp. 1997). However, if the limitations period began to run on the date on which the Data Bank information was transmitted to a health care

---

[8] We do not address a situation in which the information in the Data Bank could be accessed by the general public.

10

facility, arguably, at least one claim, based on the transmission to Baptist Hospital, would be timely. No case law in Tennessee addresses application of the statute of limitations when the plaintiff had knowledge of the likelihood of publication before it occurred.[9]

The Defendants contend that the statute of limitations should begin to run from the date in January 1992 on which Dr. Swafford knew that the allegedly defamatory information was stored with the Data Bank. The Defendants note that Dr. Swafford was aware of the likelihood that health care providers would access the report. Consequently, they maintain that he should be required to bring his action within one year of the date he discovered that the information was stored with the Data Bank. Under the Defendants' analysis, Dr. Swafford's Complaint was filed more than a year after the date of discovery and his action is barred by the statute of limitations.

In the credit report cases discussed above, the courts determined that liability arose, and the limitations period commenced, when the credit report was transmitted from the credit agency to a user. *See Hyde*, 861 F.2d at 449; *see also Lawhorn*, 515 F.Supp. at 20; *Wilson*, 921 F. Supp. at 761; *Koropoulos*, 734 F.2d at 39. One commentator discussing the FCRA noted:

> Information stored on computer software does not constitute a report until someone asks for a readout, for the contents of the report will not be discovered absent some communication. Therefore, damages do not arise until the report is communicated to a potential lender, affecting the borrower's finances, reputation, or peace of mind.

Martha F. Davis, *Solving Statute of Limitations Problems Under Fair Credit Reporting Act*, 18 Ind. L.Rev. 507, 514 (1985).

However, most of the credit report cases involve situations in which the plaintiff discovered the existence of the report *after* the report was disseminated to various businesses. For instance, in *Wilson v. Retail Credit Co.*, 438 F.2d 1043 (5th Cir. 1971), the plaintiff alleged that a credit reporting agency had released a libelous credit report about the plaintiff to several businesses. The plaintiff discovered the existence of the report *after* it was released. *Id.* at 1045. Applying Mississippi law, the Court held that the cause of action accrued, "when the report was received by defendant's customer, and not when plaintiff discovered its existence." *Id; cf. Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 334 N.E.2d 160, 164 (Ill. 1975)

---

[9] This issue was raised in *Yater*, *supra*, but resolution of that issue was not necessary. *Yater*, 861 S.W.2d at 372-73.

(holding that statute of limitations begins to run when the plaintiff knew or should have known of the report's existence); *Kelley v. Rinkle*, 532 S.W.2d 947, 949 (Tex. 1976) (same).

In *Hyde*, *supra*, the plaintiff was aware of the erroneous credit report three years before he was denied credit based on the report. He filed suit for negligence under the FCRA. The *Hyde* Court held that the limitations period for the cause of action in tort began to run when the erroneous information was transmitted from the credit agency to the potential user. The Court observed:

> The failure of the consumer to mitigate his damages by filing suit when he is first injured, thus permitting a more widespread circulation of the credit information, should have a "bearing [only] on the [calculation of] damages."

*Id.* at 450 (quoting Prosser & Keaton on the Law of Torts §113, at 800 (5th ed. 1984)).

In *Schneider*, *supra*, the plaintiffs knew of the erroneous credit report at the time the defendants filed the report with the credit reporting agency. As in this case, the defendants contended that the statute of limitations should begin to run from the date the plaintiff knew of the report. The *Schneider* Court held:

> If a plaintiff is aware of the facts giving rise to a cause of action which accrued before the cause of action on which he is suing based on the same defamatory matter as his earlier cause of action but based on a separate publication, the statute of limitations on the later cause of action does not run from the time of accrual of the first cause of action. Therefore, the fact that [plaintiffs] had knowledge that defamatory information was published by respondents when they supplied the credit information to [the credit reporting agency] does not preclude the application of the rule that a party has a cause of action for libel each time the defamatory matter is published, even if the originator of the defamatory matter did not republish the defamatory matter, as long as republication should have been reasonably foreseeable by the originator.

*Schneider*, 256 Cal. Rptr. at 75.

In this case, we need not determine whether a cause of action for libel arose at the point of transmission of the information to the Data Bank or at the point of discovery by Dr. Swafford. As noted above, both dates are beyond the one-year statute of limitations. However, since we hold that the single publication rule is inapplicable and a separate limitations period attaches to each publication, we must determine when the limitations period commenced for each claim arising out of a publication that occurred within one year prior to the filing of the complaint.

As in *Schneider*, Dr. Swafford had knowledge of the allegedly defamatory information before it was published to health care entities. Both Dr. Swafford and the Defendants could reasonably foresee that such publication would occur. However, as in *Schneider*, Dr. Swafford's prior knowledge of the defamatory information "does not preclude the application of the rule that

a party has a cause of action for libel each time the defamatory matter is published," *Schneider*, *supra*, at 75, so long as the publication is "reasonably foreseeable." A separate claim arises out of each publication, and a separate injury occurred with each publication. For each claim, "the statute of limitations begins to run at the time such dissemination takes place." *Shell*, 893 S.W.2d at 422. *See also Wilson v. Porter, Wright*, 921 F. Supp. at 761 ("The alleged violations of the FCRA committed by [the credit reporting agency] took place when the credit reports were issued . . ."). Therefore, we hold that the limitations period for each claim commenced on the date on which the potential user received the information from the Data Bank.

The record does not clearly indicate when the Data Bank transmitted the information to users such as Baptist Hospital and St. Francis Hospital. This must be determined on remand. The grant of summary judgment to the Defendants must be reversed as to claims arising out of instances in which the Data Bank transmitted information to a potential user within one year prior to the filing of Dr. Swafford's lawsuit. This holding is predicated on Dr. Swafford's prior knowledge of the existence of the information in the Data Bank.[10]

Dr. Swafford also contends on appeal that the trial court erred in applying the one-year statute of limitations to his claim of civil conspiracy. Dr. Swafford's Amended Complaint alleges that the Defendants have continued to conspire to destroy his reputation, damage his emotional well-being, ruin his practice and deprive him of revenue. He argues that civil conspiracy is an intentional tort and is governed by the three-year statute of limitations set forth in Tennessee Code Annotated § 28-3-105 (Supp. 1997). In support of his argument, Dr. Swafford cites *Budget Rent-A-Car of Knoxville, Inc. v. Car Services, Inc.*, 469 S.W.2d 360, 362, 225 Tenn. 342, 348 (1971). The *Budget* Court states:

> Conspiracy is a tort and is subject to the running of the statute of three years. The period of limitations begins to run from the time of the last overt act . . . .

*Id.* Dr. Swafford maintains that the alleged conspiracy is a "continuing" conspiracy. He argues that

---

[10] It should be noted that this Court recently addressed a situation in which the plaintiff had no prior knowledge of the potential for libel and the plaintiff discovered the libel at a date later than the point of dissemination. *See Leedom v. Bell*, No. 03A01-9704-CV-00136, 1997 WL 671918, at *7 (Tenn. App. Oct. 29, 1997) (adopting the Mississippi Supreme Court's holding that the statute of limitations should run from the point of discovery "in that limited class of libel cases which, because of the secretive or inherently undiscoverable nature of the publication the plaintiff did not know, or with reasonable diligence could not have discovered, that he had been defamed." (quoting *Staheli v. Smith*, 548 So.2d 1299, 1303 (Miss. 1989))).

each communication by the Defendants to the Data Bank "concerning Swafford without advising him of such communication constitutes a separate overt act (by omission), and . . . insofar as [the Data Bank] acts in effect as the agent of MIPA in republishing its misinformation, each and every publication and republication by [the Data Bank] to hospitals, health boards, and other concerned agencies and persons constitute a continuing and unknown number of additional overt conspiratorial acts."

"[A] civil conspiracy. . .is neither a punishable offense standing alone nor a wrong capable of supporting a cause of action by its own weight." *Wyatt v. Union Mortgage Co.*, 598 P.2d 45, 53 (Cal. 1979). Consequently, the procedural law applicable to the gravamen of the complaint applies to the civil conspiracy claim. *See Taylor v. Trans Aero Corp.*, 924 S.W.2d 109, 113 (Tenn. App. 1995); *see also Wyatt*, 598 P.2d at 53, n.4 ("it is precisely because civil conspiracy is not a tort or a cause of action itself that the tolling of the statute of limitations on the underlying torts in this case becomes relevant at all."). For example, in *Braswell v. Carothers*, 863 S.W.2d 722, 725 (Tenn. App. 1993), the Court held:

> The statute of limitations for personal injury claims is one year. T.C.A. § 28-3-104. This includes personal injuries resulting from the tort of civil conspiracy.

(citing *Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727, 729-30 (Tenn. App. 1980)). As noted above, the gravamen of Dr. Swafford's action is libel. Therefore, his claim of civil conspiracy to libel is governed by the one year statute of limitations. Tenn. Code Ann. § 28-3-104.

We must next determine when the one-year limitations period commenced as to Dr. Swafford's claim of civil conspiracy. Case law indicates that the limitations period for a civil conspiracy claim commences with the last overt act committed by the co-conspirators in furtherance of the conspiracy:

> A civil action for injury lies for a conspiracy only from the time that an overt act causing such damage has been created or enacted. As an ordinary proposition there is no civil liability for conspiracy until an overt act has been committed. *Where there is a continuing conspiracy, or where acts continue to show a conspiracy, the statute of limitations commences to run from the last overt act and not from the first . . . . It is not when the result or the suffering is continued--not when the suffering is done, but when the act is done which causes the suffering.* It is the overt act causing the conspiracy that causes the damages and it is from this act that

14

the statute begins to run and not from the suffering or the hurting as a result of the act.

*Emerson v. Machamer*, 431 S.W.2d at 283, 286 (Tenn. 1968) (citations omitted) (emphasis added);[11] *see also Budget*, 469 S.W.2d at 362, 225 Tenn. at 348.

An overt act is "an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object [of the conspiracy]." 15A C.J.S. Conspiracy §5, p. 607. Although Dr. Swafford alleges that the Data Bank acted "in effect as the agent of MIPA," the complaint does not allege that the Data Bank is an alleged co-conspirator. Therefore, the last overt act committed by the co-conspirators in this case is the Defendants' transmission of information to the Data Bank, not the Data Bank's dissemination of the information to third parties. The date of the last transmission of information to the Data Bank is unclear from the record and must be determined on remand.

The Defendants contend that Dr. Swafford fails to state a claim for civil conspiracy to libel because he can prove no damages. It is undisputed that Dr. Swafford was not denied clinical privileges by any of the health care entities that accessed the information from the Data Bank. Consequently, he can point to no tangible economic damages. However, Dr. Swafford alleges that his reputation was damaged and that he has been forced to spend numerous hours defending his record. In *Braswell* the Court held that "[d]amages for mental suffering are recoverable in an action for civil conspiracy." *Braswell*, 863 S.W.2d at 727. This issue is without merit.

Finally, the Defendants contend that Dr. Swafford's claim of tortious interference with business relations was properly dismissed since Dr. Swafford failed to demonstrate any economic harm. As noted above, Dr. Swafford concedes that his clinical privileges were not denied by an entity that accessed the information from the Data Bank.

The elements necessary to establish a prima facie claim for tortious interference with a business relationship are set out in *New Life Corp. of Am. v. Thomas Nelson, Inc.*, 932 S.W.2d 921, 927 (Tenn. App. 1996). The elements include:

> . . . the existence of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted.

---

[11] In *Emerson*, cited by Dr. Swafford, the Court applied a one year statute of limitations for the conspiracy claim. *Emerson*, 431 S.W.2d at 286.

*Id.* (quoting 45 Am. Jur. 2d *Interference* 50 (1969)); *see also Collins v. Greene County Bank*, 916 S.W. 2d 941, 947 n.3 (Tenn. App. 1995). In this case, Dr. Swafford failed to demonstrate any breach or termination of a business relationship or expectancy. He failed to establish a necessary element of this claim, and therefore the trial court correctly granted summary judgment to the Defendants on this issue.

In sum, we hold that Dr. Swafford's failure to re-file his notice of appeal and his failure to file a statement that no transcript was to be filed do not warrant dismissal of this appeal. We hold that the gravamen of Dr. Swafford's complaint is libel and that the one-year statute of limitations is applicable. We find that the "single publication rule" is not applicable under the facts of this case, and that each dissemination of the allegedly defamatory report gives rise to a separate cause of action. Any claim that may have arisen at the point of transmission of the information to the Data Bank or at the point of discovery is time-barred. As to claims arising after discovery, the limitations period for each cause of action commenced on the date of dissemination of the allegedly libelous information, i.e., the dates on which potential users received the report from the Data Bank. The case is remanded for a determination of the dates on which the Data Bank report was transmitted to users. To the extent that any transmissions of the allegedly defamatory report occurred within one year prior to the filing of Dr. Swafford's complaint, the grant of summary judgment to the Defendants is reversed.

As to Dr. Swafford's claim of civil conspiracy to libel, we hold that the one-year statute of limitations applicable to libel claims would also apply to the conspiracy claim. The limitations period for the claim of civil conspiracy commenced on the date of the last overt act by the alleged co-conspirators, the Defendants. The case is remanded for a determination of this date as well, and the grant of summary judgment on this claim is reversed if this date is determined to be within one year prior to the filing of Dr. Swafford's lawsuit. On Dr. Swafford's claim of tortious interference with business relations, the grant of summary judgment is affirmed because Dr. Swafford failed to present evidence of the breach or termination of a business relationship or expectancy.

16

The trial court's order is affirmed in part, reversed in part, and remanded for further proceedings in accordance with this Opinion. Costs on appeal are taxed equally to both parties, for which execution may issue if necessary.

_____HOLLY KIRBY LILLARD, J.

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**

_____
**DAVID R. FARMER, J.**